UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

|  |  |  |
|---|---|---|
| ERICA T. BROOKS | ) | |
| *Plaintiff*, | ) | |
| v. | ) | |
| | ) | No. 1:05-CV-328 |
| INVISTA (KOCH INDUSTRIES) | ) | Chief Judge Curtis L. Collier |
| *Defendant*. | ) | |

**MEMORANDUM**

Before the Court is Defendant Invista's ("Defendant") motion for summary judgment (Court File No. 10). Defendant filed a memorandum in support of its motion (Court File No. 11). Although Plaintiff Erica T. Brooks ("Plaintiff") filed a response (Court File No. 14) and a brief in opposition to Defendant's motion (Court File No. 20), the Court will not consider Plaintiff's response or her brief in resolving this motion since both were untimely filed. Plaintiff also filed a surreply, which she labels as a reply to Defendant's reply (Court File No. 25). For the following reasons, the Court will **GRANT** Defendant's motion for summary judgment and will **DISMISS** Plaintiff's race discrimination, hostile work environment, and Tennessee Public Protection Act ("TPPA") claims. However, because Defendant did not move for summary judgment on Plaintiff's Title VII retaliatory discharge claim, it will proceed to trial, and the Court will **RESERVE RULING** on Defendant's request for attorneys' fees.

**I. STANDARD OF REVIEW**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist, *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.*; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II. RELEVANT FACTS

Defendant is a producer of chemical intermediates, polymers and resins, and man-made fibers used in the manufacturing of nylon, spandex and polyester. (Court File No. 11, Defendant's Memorandum in Support of Motion for Summary Judgment ("Defendant's Memo") at 3). Defendant's Chattanooga facility takes product orders for specific grades, quality and type of textiles, transforms the raw materials into thread, binds it together, and ships it to customers on bobbins or rolls. (Court File No. 10, Exh. 1, Deposition of Erica Brooks ("Brooks Dep.") at 40).[1] On May 1, 2004, Plaintiff began working at Defendant's Chattanooga facility as a spinning operator. *Id.* at 64. Plaintiff received a copy of Defendant's Code of Conduct and received training on the Code of Conduct. (Exh. 2, Brooks Dep. at 93). The Code of Conduct specifically prohibits discrimination or harassment based on race or disability, including insulting comments concerning a person's disability. (Court File No. 10, Exh. 7, Code of Conduct at 16).

As a spinning operator, Plaintiff was responsible for the textile spinning machines in her area and making sure the threadlines were running through the machines correctly. (Court File No. 10, Exh. 8, Robin Williams' Declaration ("Williams Decl.") ¶3). The spinning machines have threadlines (where a polymer has been melted and is pouring through a freezer and begins hardening into lines). *Id.* The threads pour onto spools or rolls, and the full roll is the finished product that is shipped to customers. *Id.* It is very important for the threads to run smoothly onto the roll and that they are in no way damaged. *Id.* If damage occurred, the company had to either throw away

---

[1]Defendant did not file Plaintiff's deposition as one exhibit; rather, it was filed as excerpts in several exhibits. All of the exhibits are contained in Court File No. 10, so the Court will cite to Plaintiff's deposition with an exhibit number, when necessary, as follows: (Exh. 2, Brooks Dep. at 1).

the entire spool, or downgrade the product and tell the customer, who would get the product at a discount. *Id*.

To ensure proper quality, Defendant hired employees as "Quality Resources" to routinely perform quality checks to make sure the process was working and the threads were being spooled correctly. *Id*. at ¶5. If the threadlines were not being spooled correctly, Quality Resources would mark the line as off-standard. *Id*. If Quality Resources located an off-standard, they would issue an Off-Standard Corrective Action Report ("OSCAR") to the operator responsible for the machine. (Exh. 1, Brooks Dep. at 81 and 82). Quality Resources also issued Serious Quality Incident ("SQI") reports, which were issued for any incorrect product that has the potential to leave the plant and reach the customer. *Id*. at 90. If an operator is issued too many OSCARS, the operator will be written up, and multiple SQI reports result in termination. *Id*. at 90-91. Plaintiff received several OSCAR and SQI reports. *Id*. at 90. As a result, Plaintiff received a rating of "below expectations" on her performance review for the 2004 year. (Court File No. 10, Dep. Exh. 6, 2004 Non-Exempt Performance Feedback ("Perf. Feedback") at 2).

On Wednesday, February 16, 2005, Jenni Gass ("Gass"), who worked as a Quality Resource, conducted a quality inspection of Plaintiff's machines and issued two OSCARS for off-standards. (Exh. 2, Brooks Dep. at 100-101). Plaintiff asked other employees to inspect her machine, and according to Plaintiff, none of them saw any problems. *Id*. at 101. Plaintiff began looking for Gass to tell her she was wrong about the OSCARS. *Id*. at 102. Plaintiff and Gass went over to the machine and used a flashlight to inspect the machine again. *Id*. at 102. After disputing whether there was an off-standard, Plaintiff told Gass, "it's hard for me to see it with two eyes, let alone one eye." *Id*. When Plaintiff made this comment, she knew Gass had previous health issues and had

4

lost an eye. *Id*. at 104.

Gass went to find Robin Williams ("Williams"), the first line supervisor, and told her Plaintiff was upset Gass had found two off-standards on her machine, and Gass wanted to make sure she had someone to confirm the off-standards. (Williams Decl. ¶7). As Williams and Gass walked back to Plaintiff's machine, Williams noticed Gass appeared to be upset. *Id*. at ¶8. After Williams "prodded a little bit," Gass told Williams Plaintiff had made a derogatory statement about Gass having only one eye. *Id*. When they arrived at Plaintiff's machine, Williams told Plaintiff she was there to take another look at the off-standards. *Id*. at ¶9. Williams noticed the threadline was clearly off the roll, and Plaintiff agreed with the first off-standard concerning this roll. *Id*. Plaintiff disputed, however, the second off-standard concerning whether there was a missing grain. *Id*. Williams looked at the line and agreed with Gass that a grain was missing and thus concluded Gass had correctly issued both off-standards. *Id*.

After reviewing the off-standards, Williams heard Plaintiff and Gass arguing, so she asked Plaintiff to come to her office and instructed Gass to go to another office, and she would return to talk to her. *Id*. at ¶10. Williams told Plaintiff her behavior was unacceptable and questioned Plaintiff about the comment she made about Gass. *Id*. at ¶11. Plaintiff admitted making the comment, and Williams told her disrespectful comments are not tolerated. *Id*. Williams asked Plaintiff why she had not previously expressed concerns about Gass' eyesight. (Exh. 3, Brooks Dep. at 121). Plaintiff stated Cheryl Vaughn, Plaintiff and Gass' supervisor, did not listen to anything anyone said about Gass. *Id*. Plaintiff also made allegations that Gass had been leaving the facility without permission and without writing it down on her time card. *Id*. at 125. After this conversation, Williams contacted her supervisor, Dave Forsthoffer ("Forsthoffer"), and informed

5

him about Plaintiff's comment to Gass and Plaintiff's allegations against Gass. (Williams' Decl. ¶15).

The next day, Thursday, February 17, 2005, Forsthoffer had a meeting with Williams and Plaintiff to discuss the issues. (Exh. 3, Brooks Dep. at 133). Plaintiff admitted making the comment to Gass about her eye, and made the following allegations about Gass: (1) Gass was not keeping her time accurately; (2) Gass was pairing people together on the line to make her numbers look better; (3) Gass did not know how to identify quality issues; (4) Gass used overtime rather than bringing in additional employees if a line was short; and (5) Gass went home to let her dogs out and had to have another employee write-up an injury report. (Exh. 4, Brooks Dep. at 146). At the conclusion of the meeting, Forsthoffer called Sue Koopman ("Koopman"), the Human Resources Site Manager, and told her about the incident. (Court File No. 10, Exh. 11, Declaration of Dave Forsthoffer ("Forsthoffer Decl.") at ¶4). Plaintiff, Gass, and Vaughn were sent home and an investigation ensued regarding Plaintiff's allegations about Gass. *Id*. The investigation revealed Gass' supervisor had given her permission to leave the facility during shifts, and Plaintiff's allegations were unfounded. (Court File No. 10, Exh. 9, Declaration of Joe Perry ("Perry Decl.") at ¶7).

The investigation surrounding Plaintiff's comment to Gass revealed Plaintiff made harassing comments concerning Gass' loss of an eye; Plaintiff admitted making the comment and showed no remorse; Plaintiff continued to say Gass could not see and only has one eye; and Plaintiff never accepted the fact she had off-standards, even though they were verified and beyond dispute. *Id*. at ¶6. At this point, Defendant began considering whether to discipline and/or terminate Plaintiff. Defendant considers questions of discipline and termination in progressive groups, starting with the HR Personnel Core Team. (Forsthoffer Decl. at ¶4). This team tests potential terminations against

company policies, and after making a recommendation about termination, the matter goes to a staff team, who reviews the matter anew. *Id*. The ultimate decision of whether to terminate rests with Ben Melnycuk ("Melnyczuk"), the facility manager. *Id*.

In deciding the issue of Plaintiff's discipline, the HR Personnel Core Team determined Plaintiff had violated company policy, and her violation was a terminable offense. (Forsthoffer Decl. at ¶4). Then, the matter was considered by the staff team. They considered the following factors: (1) Plaintiff had off-standards; (2) Plaintiff was already on "write-up" for a previous quality issue; (3) Plaintiff committed a Code of Conduct violation when she made the comment about Gass' eye; and (4) Plaintiff showed a lack of remorse for the situation since during the investigation she continued to state Gass could not see with one eye. (Court File No. 10, Declaration of Ben Melnyczuk ("Melnyczuk Decl.") at ¶7). The staff team unanimously voted to terminate Plaintiff's employment. *Id*. at ¶8. On March 2, 2005, Williams called Plaintiff and told her she was terminated. (Exh. 5, Brooks Dep. at 169).

## III. DISCUSSION

Plaintiff's complaint alleges Defendant (1) terminated her because of her race; (2) subjected her to a hostile work environment; and (3) discharged her in retaliation as prohibited by the TPPA and Title VII. Defendant argues Plaintiff cannot establish a prima facie case with respect to three of these claims. The Court will address each claim in turn.

### A. Race Discrimination Claim

In her complaint, Plaintiff alleges she was terminated because of her race. Defendant moves for summary judgment on Plaintiff's claim, contending Plaintiff was not qualified for the position

7

and was not replaced by a person outside her protected class or treated differently than similarly-situated employees outside her protected class. For the following reasons, the Court will **GRANT** Defendant's motion for summary judgment, and Plaintiff's claim for race discrimination will be **DISMISSED**.

A plaintiff "may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citations omitted). "The direct evidence and circumstantial paths are mutually exclusive; the plaintiff can meet her burden with either method of proof." *Weberg v. Franks*, 229 F.3d 514, 523 (6th Cir. 2000). Plaintiff has not presented any direct evidence the individuals responsible for making the termination decision were motivated by racial animus. Accordingly, the Court assumes she bases her claim on circumstantial evidence.

When relying on circumstantial evidence to prove a claim of discrimination, a burden-shifting paradigm is employed. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as later clarified by, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under this paradigm, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802. To establish a prima facie case of race discrimination, a plaintiff must show (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 349 (6th Cir. 1997).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to

"articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802; *Logan v. Denny's, Inc*., 259 F.3d 558, 567 (6th Cir. 2001). If the defendant is able to articulate a legitimate, nondiscriminatory reason for the action, then Plaintiff must prove the proffered reason was actually a pretext for discrimination. *Id*. Pretext can be proven by showing the stated reason (1) had no basis in fact, (2) was not the actual reason, or (3) was insufficient to explain Defendant's action. *Logan*, 259 F.3d at 567.

Plaintiff has met the first two elements of her prima facie case: she is African American and therefore a member of a protected class for the purposes of a race-discrimination claim. Further, Defendant does not contest Plaintiff suffered an adverse employment action. Accordingly, the Court will address whether Plaintiff was qualified for the position and if she was replaced by a person outside the protected class.

### 1. Qualified for the Position

Defendant argues Plaintiff was not qualified for the spinning operator position since she received multiple written corrective actions, which could result in termination, and her performance evaluation placed her at the very bottom of the scale. To be considered qualified for the position, Plaintiff must have been performing her job "at a level which met [her] employers legitimate expectations." *McDonald v. Union Camp Corp*., 898 F.2d 1155, 1160 (6th Cir. 1990). Defendant's evidence shows Plaintiff did not meet their legitimate expectations. Plaintiff received multiple OSCAR and SQI reports while employed with Defendant. On her February 2004 performance evaluation, she received a rating of "below expectations." (Perf. Feedback at 2). Since this evidence is undisputed, Plaintiff cannot establish she was qualified for the position, and summary judgment is appropriate on this ground.

9

## 2. Replaced by a Person Outside the Protected Class

Plaintiff satisfies this element if she demonstrates she was replaced by a person outside the protected class or she was treated less favorably than a similarly situated, non-protected employee. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). Plaintiff admitted during her deposition no one was hired to replace her as spinning operator, and her husband, who is African American, assumed her duties when she left the company. (Brooks Dep. at 178). Thus, to meet this prong, Plaintiff must show she was treated less favorably than a similarly situated, non-black employee.

"[T]o be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Plaintiff was terminated because she made a harassing comment regarding Gass' disability. Defendant points to the following testimony given by Plaintiff to support its contention she cannot establish this prong:

> Q. That's okay. Do you know of anyone else at Invista who the company ever said had violated the harassment policy?
> A. No, no.
> Q. Do you know of anyone else who ever made any discriminatory remarks towards another person at Invista?
> A. Not of my knowledge. . .
> Q. Do you feel like there was anyone else who was in a similar situation to you, as far as making this comment against somebody, or doing something along those lines, and were not terminated?
> A. No. I don't know. I--no. I don't know. I can't say.

(Brooks Dep. at 191-193). From this testimony, it is clear Plaintiff cannot prove she was treated less favorably than a similarly situated non-black employee. Accordingly, the Court finds Plaintiff

cannot establish a prima facie case of race discrimination, and Defendant's motion for summary judgment on this issue will be **GRANTED** and Plaintiff's race discrimination claim will be **DISMISSED**.

B. **Hostile Work Environment**

Plaintiff alleges she was subjected to a hostile working environment. The only mention of this claim in Defendant's motion is contained in a footnote where Defendant states Plaintiff cannot establish a claim for hostile work environment. (Court File No. 11, Defendant's Memo at 12, n.2). Defendant argues there is no evidence Plaintiff was harassed since she specifically testified she was never harassed by anyone while working for Defendant, and when asked if she ever worked in a hostile work environment, Plaintiff responded she had not. The Court concludes this language is sufficient to constitute a motion for summary judgment on Plaintiff's hostile work environment claim, to the extent Plaintiff asserts such a claim, and interprets it as such.

To establish a prima facie case of hostile work environment based on race, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with her work environment by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Newman v. Federal Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). "A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The workplace environment "must be both objectively and subjectively offensive, one that

11

a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 21-22).

In determining whether there was a hostile or abusive work environment, the Court must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88. "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether-taken together-the reported incidents make out such a case." *Bowman*, 220 F.3d at 463 (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999)). Isolated incidents alone must be extremely serious to serve as a basis for liability. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

### 1. Unwelcome Harassment

During her deposition, Plaintiff stated she was not harassed while employed with Defendant, and she did not believe she worked in a hostile work environment:

> Q. Do you feel like you were ever harassed in any way while you were at Invista?
> A. With Invista?
> Q. Uh-huh.
> A. No, not with Invista. . . .
> Q. Do you ever feel like you worked in a hostile environment?
> A. No, because I loved my job. No. I enjoyed it.

(Brooks Dep. at 204). To prove a hostile work environment, Plaintiff must subjectively perceive the environment to be hostile. Since Plaintiff herself did not perceive her environment to be hostile, she cannot establish her prima facie case. Thus, no genuine issue of material fact exists with respect to this element and summary judgment is proper on these grounds.

## 2. Severe and Pervasive Work Environment/ Employer Liability

In addition to a plaintiff having to subjectively perceive the environment as hostile, a plaintiff must prove that the environment is objectively hostile. Plaintiff admitted during her deposition she was never subjected to any comments based on her race and she never heard any comments about someone else's race:

> Q. Okay. So there was - - there were never any comments related to your race that were directed towards you while you worked at Invista?
> A. That's correct, that's correct.
> Q. Okay. Were there comments that you overheard directed towards other people about their race?
> A. It wasn't about race. Its' more like - - it's more like, you know, the cursing and, you know, people getting called bitches, stuff - - it was more like that, you know, nothing like, you know, the skin color or nothing.

(Brooks Dep. at 174). If no comments were ever made regarding Plaintiff's race or anyone else's race for that matter, there is no way a reasonable person could find the environment was hostile or abusive. Thus, Plaintiff cannot establish a prima facie case for a racially hostile work environment. Furthermore, since the Court has concluded Plaintiff cannot demonstrate the existence of a hostile work environment, there is no need to reach the issue of vicarious liability. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) ("An employer is subject to vicarious liability to a victimized employee for an *actionable* hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.") (emphasis added). Therefore, Defendant's summary judgment motion will be **GRANTED**, and Plaintiff's race-based hostile work environment claim will be **DISMISSED**.

### C. Plaintiff's TPPA Retaliation Claim

Plaintiff alleges she was terminated in retaliation for reporting the illegal actions of other employees, specifically, Gass' alleged time card violations. Defendant argues Plaintiff cannot

establish a prima facie case because (1) Defendant encouraged Plaintiff to tell them about the violations rather than asking her to remain silent; and (2) even if Plaintiff could prove element number two, Plaintiff cannot establish it was the sole reason for her termination since she was fired for making an insulting comment about Gass' disability. The Court will **GRANT** Defendant's motion for summary judgment, and Plaintiff's claim for retaliation under the TPPA will be **DISMISSED**.

Tennessee law protects employee-whistleblowers under the common law and the TPPA. Plaintiff has brought her claim under the TPPA, not the common law. The TPPA provides "[n]o employee shall be discharged or terminated solely for refusing to participate in, or refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a) (2006). The prima facie case of retaliatory discharge in violation of the TPPA consists of four elements:

> (1) The plaintiff's status as an employee of the defendant;
> (2) The plaintiff's refusal to participate in, or to remain silent about, illegal activities;
> (3) The employer's discharge of the employee; and
> (4) An exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

*Hill v. Perrigo of Tennessee*, No. M2000-02452-COA-R3-CV, 2001 WL 694479, at *3 (Tenn. Ct. App. June 21, 2001); *see also Griggs v. Coca-Cola Employees' Credit Union*, 909 F. Supp. 1059, 1063 (E.D. Tenn. 1995).

Once a plaintiff has established a prima facie case, "the burden shifts to the employer to advance a non-discriminatory reason for the termination." *Hill*, 2001 WL 694479, at *4. The burden then shifts back to the plaintiff "to show that [her] termination was solely for the reasons which [s]he initially alleged." *Id.* "Courts have recognized 'that the plaintiff has indeed a formidable burden in establishing elements [] two and four of the cause of action.'" *Id.* at *5 (quoting *Darnall*

*v. A+ Home Care, Inc.*, No. 01-A-01-9807-CV-0034, 1999 WL 346225, at *5 (Tenn. Ct. App. June 2, 1999)). To succeed in proving element number four, the plaintiff must show she was terminated *solely* because of her whistleblowing activity. *Id.* at *6.

### 1. Refusal to Participate in or Remain Silent About Illegal Activities

Defendant argues the activities reported by Plaintiff, if proven to exist, would have violated company policy but did not constitute illegal activity. The TPPA defines illegal activities as "activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(c). The activity reported by Plaintiff was Gass would leave work early without permission and without writing it down on her time card. The Court agrees with Defendant that this activity does not constitute an illegal activity under the TPPA because it does not violate a civil or criminal code of Tennessee or the United States or any regulation intended to protect the public health, safety or welfare. Furthermore, after an investigation into Plaintiff's allegations, Defendant found Gass had not violated any policy because she had permission to leave work early, and Plaintiff's accusations were completely unfounded. Thus, it was impossible for Plaintiff to have been fired for reporting illegal activity when no illegal activity existed.

### 2. Exclusive Causal Relationship

Even if Plaintiff could prove she refused to participate in, or to remain silent about, illegal activities, her claim under the TPPA still fails because she cannot prove she was fired exclusively for that reason. Defendant terminated Plaintiff because she violated the Code of Conduct when she made an insulting comment about Gass' disability. Plaintiff admitted during her deposition she made this comment, the comment violated the Code of Conduct, and she could be terminated for

making the comment. In light of this evidence, Plaintiff cannot establish the sole reason she was fired was because of her whistleblowing activity. Therefore, the Court will **GRANT** Defendant's motion for summary judgment, and Plaintiff's claim under the TPPA will be **DISMISSED**.

### D. Title VII Retaliation Claim

In her complaint, Plaintiff alleges her termination constituted a retaliatory discharge as prohibited by Title VII. Defendant did not address this claim in its motion for summary judgment. Since Defendant did not move for summary judgment on this claim, Plaintiff's claim for retaliatory discharge in violation of Title VII will proceed to trial.

### E. Attorneys' Fees

At the end of its motion for summary judgment, Defendant asked for attorneys' fees and costs in defending against this action, both under Title VII and the TPPA, since Plaintiff's action is frivolous. Under Title VII, if the plaintiff has asserted at least one non-frivolous claim, then attorneys' fees may not be awarded. *Balmer v. HCA, Inc.*, 423 F.3d 606, 617 (6th Cir. 2005). Since Plaintiff's retaliation claim pursuant to Title VII was not addressed in Defendant's summary judgment motion and will proceed to trial, it would be premature for the Court to decide at this time whether attorneys' fees are appropriate. Therefore, the Court will **RESERVE RULING** on this issue until after the trial.

### F. Plaintiff's Untimely Response

As the Court noted at the beginning of this memorandum, it did not consider Plaintiff's response or brief in opposition to Defendant's motion since it was untimely filed. *See Spurlock v. Whitley*, 79 Fed.Appx. 837, 840 (stating the district court properly disregarded plaintiff's late-filed briefs in considering a summary judgment motion). Even if the Court had considered Plaintiff's

16

response and brief before ruling on the summary judgment motion, they were both inadequate to defeat summary judgment. Plaintiff's response consisted of two sentences stating Defendant's motion should be overruled; the case should proceed to trial; and a brief, affidavits and exhibits in support of opposition would be filed. Obviously, these statements even if timely filed, were not sufficient to create a genuine issue of material fact.

Likewise, the brief was not sufficient to defeat summary judgment. In her brief, Plaintiff cited to the record a total of four times yet none of those facts created a genuine issue of material fact as to any of her claims. Plaintiff's attempt to place this burden on the Court by stating her "brief incorporates the deposition excerpts, selections of company guidelines, official findings of the Appeals Tribunal granting Plaintiff unemployment, her discharge notice, interrogatory responses and last evaluation prior to discharge" was futile. (Court File No. 20, Plaintiff's Brief in Opposition to Summary Motion, at 1). It is Plaintiff's obligation to designate specific facts showing there is a genuine issue of material fact, and the Court is not required to search through the record to find genuine issues of material fact. *See Georgeff v. Sears, Roebuck and Co.*, No. 87-3602, 1988 WL 37443, at *1 (6th Cir. Apr. 25, 1988) (rejecting the plaintiff's argument the court was required to search interrogatories and depositions for facts which raised a material issue of fact, even though they were not called to the trial court's attention by trial counsel); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992) (noting while the nonmoving party may not have to designate facts by citing specific page numbers, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies."). Therefore, even if the response and brief filed by Plaintiff had been timely filed, Defendant's motion for summary judgment still would have been granted.

17

### G. Plaintiff's Surreply

Plaintiff filed a surreply in opposition to Defendant's motion for summary judgment asking the Court to overrule Defendant's motion. Plaintiff attached her own personal notes and investigation interview notes obtained from Defendant after the magistrate judge granted Plaintiff's motion to compel. The Court notes supplemental briefs can only be filed with leave of the Court unless they are used to bring to the Court's attention new developments that occurred after a party's final brief was filed. *See* E.D. Tenn. Local R. 7.1(d). Plaintiff's own notes clearly are not new developments and would not serve as a basis for filing a surreply without leave of the Court.

The investigative notes received as a result of the motion to compel, however, may constitute a new development. However, Defendant did not cite to any part of the notes she was relying on to dispute Defendant's summary judgment motion. Instead, Plaintiff states the notes are attached and filed in opposition to Defendant's motion. As noted above, Plaintiff has the burden of presenting a genuine issue of material fact, and the Court is not obligated to search the record and find those facts for her. *Georgeff*, 1988 WL 37443, at *1; *Guarino*, 980 F.2d at 405. As such, Plaintiff's surreply did not create a genuine issue of material fact, and Dependant's motion for summary judgment will be granted.

### IV. CONCLUSION

For the reasons stated above, the Court finds Plaintiff has failed to create a genuine dispute of material fact with respect to her race discrimination claim, hostile work environment claim, and TPPA retaliatory discharge claim. As a result, the Court will **GRANT** Defendant's motion for summary judgment. However, because Defendant did not move for summary judgment on

Plaintiff's Title VII retaliatory discharge claim, it will proceed to trial, and the Court will **RESERVE RULING** on whether attorneys' fees should be granted to Defendant.

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**